UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

S.G., on behalf of herself and on behalf of her
child, K.B.,

                    Plaintiffs,

          v.

SUCCESS ACADEMY CHARTER SCHOOLS, INC.,
EVA MOSKOWITZ, in her individual and official
capacity as Chief Executive Officer of Success
Academy Charter Schools, Inc., JAVERIA KHAN,
in her individual and official capacity as
Managing Director of Schools for Success
Academy Charter Schools, Inc., SUCCESS
ACADEMY BRONX 2, and ANGELA INSLEE in her
individual and official capacity as Principal of
Success Academy Bronx 2,

                    Defendants.

18 Civ. 2484 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

      Plaintiff S.G., individually and on behalf of her special-needs child, K.B.,

(collectively, "Plaintiffs"), bring this action against Success Academy Charter

Schools Inc. and several of its agents (collectively, "Defendants"), alleging

claims under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.

§§ 12131-12134, 12141-12165 (the "ADA"); Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794; 42 U.S.C. § 1983; and the New York State

Constitution.  While this case initially came to the Court on an application for

emergent relief to prevent K.B.'s grade demotion mid-year, S.G. has since

withdrawn K.B. from the Success Academy school that he attended.  Instead,

Plaintiffs now allege that Defendants discriminated against K.B. as a result of

his disabilities and engaged in a campaign to drive him from the school.

Defendants move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As evidenced during the injunction proceedings, both sides have passionate, deeply-held, and at times warring views on numerous macro and micro issues in education. But the Court's role at this stage of the litigation is limited: to consider the well-pleaded allegations in Plaintiffs' pleadings, and whatever documents the Court may properly consider on a motion to dismiss, and determine whether they survive Defendants' legal challenges. In large measure, they do. For the reasons stated in this Opinion, Defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

### A.    The Legal Framework

This case began as a challenge under the Individuals with Disabilities Education Act (the "IDEA," formerly known as the Individuals with Disabilities

---

[1]    This Opinion draws on facts from two sources: the Second Amended Complaint ("SAC" (Dkt. #51)), and exhibits attached to the Declaration of Robert L. Dunn that are incorporated by reference or integral to the pleading ("Dunn Declaration" or "Dunn Decl." (Dkt. #57), specifically Exhibit 3 (K.B.'s fourth-grade report card); Exhibit 5 (Plaintiffs' due process complaint); and Exhibit 6 (Findings of Fact and Decision of the Impartial Hearing Officer ("IHO"))). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-60 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss). The Court also considers the Dunn Declaration and exhibits in evaluating its subject matter jurisdiction. *See Zappia Middle East Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000);

Act), 20 U.S.C. §§ 1400-1482, and, to a degree hotly disputed between the parties, it still has ties to that legal regime.  Accordingly, the Court begins with a primer on litigation under the IDEA.

The IDEA "requires states to provide disabled children with a 'free appropriate public education'" (a "FAPE").  *Florence Cty. Sch. Dist. Four* v. *Carter*, 510 U.S. 7, 9 (1993) (citation omitted); *see R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012).  Accordingly, school districts must create an individualized education program ("IEP") for each qualifying child in order to ensure that the child receives a FAPE.  *See R.E.*, 694 F.3d at 175.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A).  At the cornerstone of the IDEA is the requirement that the IEP be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207

---

*accord Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014).

For convenience, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #56), to Plaintiffs' opposition to the motion to dismiss as "Pl. Opp." (Dkt. #58), and to Defendants' reply as "Def. Reply" (Dkt. #62).

(1982); *see also Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

If a parent believes that his or her child's IEP fails to comply with the IDEA, the parent may seek relief by filing a due process complaint with the appropriate state agency. 20 U.S.C. § 1415(b)(6). Upon the filing of a due process complaint, federal law mandates that the parent be provided with an impartial due process hearing before the New York City Department of Education's Impartial Hearing Office (the "IHO"). *Id.* § 1415(f).[2] New York law, in turn, requires a parent to pursue his or her claim first before the IHO; once the IHO renders a decision, either party may appeal the decision. N.Y. Educ. Law § 4404(1), (2). After the administrative appeal of the IHO's decision, either party may file an action in state or federal court seeking review of the SRO's decision. 20 U.S.C. § 1415(i)(2)(A).

## B. Factual Background

### 1. The Parties

The Court accepts, as it must at this stage, the well-pleaded allegations of the operative pleading, Plaintiffs' Second Amended Complaint (or "SAC"). The SAC recites that Plaintiff K.B. is a ten-year-old child with a disability involving a seizure disorder, as well as diagnoses of Attention Deficit/ Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD").

---

[2]     In the case law and in this Opinion, "IHO" sometimes refers to the Independent Hearing Office and sometimes to an Independent Hearing Officer.

(SAC ¶ 8).  K.B. requires special education services and accommodations because of his disability.  (*Id.*).  Plaintiff S.G. is K.B.'s mother.  (*Id.* at ¶ 9).  Success Academy Bronx 2 ("Success Academy") is a charter school managed by Success Academy Charter Schools, Inc.  (*Id.* at ¶¶ 10, 12).

### 2.    K.B.'s Early Years at Success Academy

When K.B. entered kindergarten at Success Academy in 2012, the Department of Education ("DOE") developed an IEP for K.B. describing his disabilities and the services and accommodations that should be provided to him as a result.  (*Id.* at ¶¶ 36, 48-57).  Success Academy followed the recommendation of the IEP to place K.B. in an Integrated Co-Teaching class (an "ICT" class), which means a class that includes both general and special education students.  (*Id.* at ¶¶ 49-51).  Despite K.B.'s attention difficulties, and the challenges these difficulties created for his school performance, Success Academy promoted K.B. to first grade, and later to second grade at the end of the 2013-2014 school year.  (*See id.* at ¶ 51).

In November 2014, the DOE again evaluated K.B. and determined that his difficulties had affected his ability to perform at grade level.  (SAC ¶ 52).  Following the 2014-2015 school year, Success Academy decided to keep K.B. in the second grade.  (*Id.* at ¶ 53).  "In explaining the decision to retain K.B. in the second grade, school officials claimed that K.B. would not be 'mature enough' to take the standardized tests administered to all third graders in New York State."  (*Id.*).  "S.G. did not agree with the retention decision because she believed K.B. was 'mature' for his age.  S.G. believed the decision was instead

based on the difficulties the school had in dealing with K.B.'s disability related behaviors and how these behaviors could impact his performance and the performance of his classmates on the state assessments." (*Id.* at ¶ 55). Nonetheless, S.G. did not challenge the decision because she believed that she and the school officials were both working to further her son's best interests. (*Id.*).

In the summer of 2015, the DOE conducted another evaluation and determined that K.B.'s disabilities required that he be placed in "a special class with a staffing ratio of 12 students to 1 teacher (12:1). Defendants did not offer a 12:1 class for K.B. despite the new recommendation and kept him in a similar ICT class to the one Defendants had placed him in for the prior school year." (SAC ¶ 57). During the 2015-2016 school year, S.G. received "on average two calls per week from officials at [Success Academy] demanding that she remove her son from school because of his disruptive behaviors." (*Id.* at ¶ 146). On multiple occasions during these calls, school officials "threatened to report S.G. to child protective services if she did not respond quickly enough to their calls to remove K.B. from school." (*Id.* at ¶ 147).

On April 14, 2016, school officials called S.G. "claiming that K.B. had threatened to commit suicide[.]" (SAC ¶ 59). Before S.G. arrived, school staff "had K.B. removed by Emergency Medical Services ('EMS') and taken to the emergency room," where "K.B. told the emergency room personnel that he had not threatened to hurt himself," and was discharged the same day. (*Id.* at ¶¶ 59-60).

6

### 3.    K.B.'s 2015-2016 and 2016-2017 School Years

Following the 2015-2016 school year, K.B. was promoted to third grade. (SAC ¶ 63).  The threats to report S.G. to child protective services continued into the 2016-2017 school year.  (*Id.* at ¶ 147).  During this year, the school and school district also reevaluated K.B.'s need for services.  (*Id.* at ¶ 63).  On December 14, 2016, the DOE developed a new IEP, which "again recommended a 12:1 special class program with the related services of counseling."  (*Id.* at ¶ 64).  Success Academy officials told S.G. that they did not offer 12:1 classes, and that "she would have to withdraw K.B. from [Success Academy] and place him in a local neighborhood New York City public school if she wanted K.B. to receive a 12:1 class."  (*Id.* at ¶ 65).  School officials did not inform S.G. that 12:1 classes "were available in other schools within Defendants' network of charter schools."  (*Id.* at ¶ 66).

S.G. declined to withdraw K.B., and he was kept in the ICT class despite the IEP recommendation.  During the 2016-2017 school year, "K.B. met Defendants' promotion criteria and was promoted to the fourth grade for the 2017-2018 school year."  (SAC ¶ 68).  However, in June 2017, school officials informed S.G. that they might demote K.B. back to third grade during the upcoming school year.  (*Id.*).  At the end of the 2016-2017 school year, S.G. signed a reenrollment letter "affirming her intention to continue K.B.'s enrollment" at Success Academy.  (*Id.* at ¶ 70).

### 4.     K.B.'s 2017-2018 School Year

#### a.     The First Day of Classes

During the end of the 2017 summer recess, school officials requested a meeting with S.G. to discuss K.B.'s progress.  (SAC ¶ 69).  S.G. initially agreed to the meeting, but later cancelled due to concern about "attending the meeting alone without representation and without knowledge about the nature of the meeting."  (*Id.*).  When the Principal of Success Academy, Defendant Angela Inslee, attempted to reschedule the meeting and did not receive an "immediate response from S.G.," she emailed S.G. on August 10, 2017, informing her that Inslee had "processed the withdrawal for K.B. effective immediately."  (*Id.*).  According to Plaintiffs, "S.G. tried to contact school officials to discuss the email but no one returned her messages."  (*Id.* at ¶ 70).  After a series of communications failures and claims by school officials "that S.G. had requested a withdrawal for K.B.," S.G. took K.B. to the first day of classes on August 14, 2017, and was told that K.B. had been withdrawn and would be unable to attend class.  (*Id.* at ¶¶ 73-74).  Following a meeting between S.G. and school officials on August 15, 2017, K.B. was enrolled and allowed to attend class, though he ultimately missed the first day of classes.  (*Id.* at ¶ 76).

At the August 15, 2017 meeting, "school officials stated that K.B. would be demoted if he did not meet the fourth-grade academic standards during the 2017-2018 school year.  They also stated they would suspend K.B. if he acted as he did during the prior school year."  (SAC ¶ 76).  S.G. complained that K.B. was not being placed into the smaller class mandated by his IEP, Defendant

Inslee informed S.G. that such classes were not provided at the school, and that, "if K.B. did not meet fourth grade expectations he would be placed back in the third grade[.]" (*Id.* at ¶¶ 76-77).

### b.   The Hospitalization of K.B.

On September 11, 2017, K.B. became upset upon observing an "unsatisfactory behavior" rating on his behavioral chart, crawled under his desk, and refused to line up to go to lunch in the cafeteria. (SAC ¶ 86). K.B. eventually came out from under the desk, and "remained in the classroom in a calm manner with his paraprofessional and the assistant principal and ate some snacks." (*Id.*). Shortly thereafter, police officers entered the room, causing K.B. to become anxious and to attempt to leave the room. (*Id.* at ¶ 87). "Before he could walk away, the officers convinced K.B. that he was not in trouble and that they only wanted to talk with him. K.B. returned to the classroom and spoke with the officers. Not long thereafter, emergency medical technicians arrived and began to speak with K.B." (*Id.*).

K.B. was taken to the hospital, where "he was found not to require treatment and was discharged that evening." (SAC ¶¶ 88, 90). K.B.'s paraprofessional stated that, while working with K.B. that day, she "did not observe any behavior causing her to believe K.B. was in imminent danger of causing harm to himself, to others, or to property." (*Id.* at ¶ 91). S.G. has never received a report explaining why school officials called Emergency Medical Services ("EMS"), or why K.B. was hospitalized. (*Id.*).

Later, at a September 15, 2017 meeting, Defendant Inslee explained to S.G. that school officials had called EMS because K.B. "had been screaming and it was at this point that school officials felt they needed to call EMS," but "could not give a medical reason for the transport." (SAC ¶ 95). During that same September 15, 2017 meeting, S.G.'s attorney "requested that in [the] future school officials provide reasonable accommodations to [Success Academy's] discipline practices when applied to K.B." (*Id.*). Defendant Inslee responded that Defendants made "no modifications" to their disciplinary policy. (*Id.*). During a subsequent October 18, 2017 meeting with Defendant Inslee, "S.G. also complained that all of K.B.'s assignments were strictly timed and no accommodations were being given to students with disabilities like K.B." (*Id.* at ¶ 100).

### c.   The ACS Investigations

On October 19, 2017, S.G. learned that the Administration for Children's Services ("ACS") had opened an investigation of her due to "educational neglect," based on K.B.'s school absences. (SAC ¶ 101). In November 2017, K.B.'s Trimester 1 Progress Report stated that he was "approaching expectations" in Reading and Math, but that he was "below expectations" in Writing and Science; neither designation is a passing grade. (*Id.* at ¶ 104). That said, K.B. had received 100% on a grammar quiz administered on November 17, 2017, and 80% on a spelling test administered the same day. (*Id.*). In or about April 2018, S.G. learned that another referral had been made to ACS alleging that K.B. was "travelling alone to school." (*Id.* at ¶ 136).

During the 2017-2018 school year, K.B. was suspended for a total of ten days. (*Id.* at ¶¶ 82 (one-day suspension), 94 (three-day suspension), 99 (one-day suspension), 103 (five-day suspension)).

### d.   The Demotion

On December 6, 2017, S.G. met with Defendant Javeria Khan, Managing Director of Schools for Success Academy Charter Schools, and other school officials.  (SAC ¶ 105).  According to Plaintiffs, "Ms. Khan informed S.G. that K.B. was going to be demoted in January, 2018, when classes resumed after the holiday break.  Ms. Khan stated that the demotion was necessary because K.B. had not been able to do the 4th grade work." (*Id.*).  S.G. disagreed with the demotion, arguing that K.B. had not been provided adequate special education services, including the absence of consistent and continuous support from a paraprofessional, and "that K.B. had been academically disadvantaged due to the failure of school officials to provide alternative instruction during the days K.B. was suspended during the first four months of the school year." (*Id.* at ¶ 106).  Nonetheless, Defendants Khan and Inslee refused to reconsider the demotion.  (*Id.*).  K.B. was upset and embarrassed by the demotion, and some of his classmates consistently teased him about it.  (*Id.* at ¶¶ 114-15, 119-20).

## C.   Procedural Background

### 1.   The IHO Hearing and the Application for a TRO

Administrative and judicial proceedings then commenced.  On January 2, 2018, Plaintiffs filed a due process complaint alleging violations of

the IDEA and Section 504 of the Rehabilitation Act, and seeking a "stay-put" order to return K.B. to the fourth grade.  (SAC ¶ 111; Dunn Decl., Ex. 5).  A subsequently-filed amended complaint alleged that Success Academy had failed to provide K.B. with a FAPE as required by the IDEA, the New York State Education Law, and Section 504 of the Rehabilitation Act.  (Dunn Decl., Ex. 5 at 2).  Specifically, S.G. alleged that Success Academy had failed to provide S.G. with adequate paraprofessional services and a 12:1 class program as required by his IEP, and requested that Success Academy "pay for compensatory services of a one to one tutor[.]"  (*Id.* at 3-4).  On January 2, 2018, it is alleged, S.G. informed Success Academy's counsel, Vanessa Marie Biondo, about the IHO complaint, but Ms. Biondo "refus[ed] to halt the demotion and stat[ed] that the demotion of K.B. to the third grade would be effective on January 5, 2018."  (SAC ¶ 110).

On February 9, 2018, "a pendency hearing was held to determine the pendency or 'stay put' status of K.B. before impartial hearing officer ('IHO') Lana Flame."  (SAC ¶ 121).  On March 2, 2018, the IHO issued an interim pendency order requiring that K.B. be returned to the fourth grade during the pendency of the administrative proceeding.  (*Id.* at ¶ 123).  Nonetheless, Success Academy refused to return K.B. to the fourth grade.  (Dunn. Decl., Ex. 6 at 16).

On March 20, 2018, Plaintiffs filed a complaint, an order to show cause, and an application for a temporary restraining order ("TRO") in this Court. (Dkt. #1, 5-8).  By Order dated March 26, 2018, the Court denied the

application for a show-cause order and a TRO, and scheduled Plaintiffs' motion for a preliminary injunction. (Dkt. #11). On April 10, 2018, Plaintiffs filed an amended complaint and a TRO application. (Dkt. #22, 24). On May 8, 2018, after a hearing one day earlier, this Court granted Plaintiffs' motion for injunctive relief to enforce the pendency order, requiring that K.B. be returned to the fourth grade. (Dkt. #42; SAC ¶ 128). K.B. returned to the fourth grade on May 8, 2018. (SAC ¶ 128). K.B. completed the 2017-2018 school year in the fourth grade, following which S.G. withdrew him from Success Academy. (*Id.* at ¶¶ 47, 140).

On July 26, 2018, the IHO issued a decision agreeing with Plaintiffs that K.B. had been denied a FAPE due to Success Academy's failure to provide him with a 12:1 classroom and consistent paraprofessional services. (Dunn. Decl., Ex. 6 at 13-14). The IHO also found that Success Academy had violated the IDEA by refusing to return K.B. to the fourth grade during the appeal of the IHO's pendency order. (*Id.* at 16). The IHO ordered the DOE to pay for 375 hours of compensatory tutoring in order to "place [K.B.] in the position he would have been in had the district complied with its obligations under the IDEA." (*Id.* at 17-18). No appeal was taken from that decision.

### 2.    The Instant Motion

As noted, Plaintiffs commenced this action with the filing of the initial Complaint on March 20, 2018. (Dkt. #1). Plaintiffs filed a First Amended Complaint (the "FAC") on April 10, 2018. (Dkt. #22). Defendants moved to dismiss the FAC on June 8, 2018. (Dkt. #46). In response, on July 20, 2018,

13

Plaintiffs filed the SAC, which removed Plaintiffs' claims under the IDEA and their requests for injunctive relief, and which now seeks declaratory relief, monetary damages, attorneys' fees, and costs.  (Dkt. #51; Pl. Opp. 2).  The SAC alleges violations of the ADA and of Section 504 of the Rehabilitation Act (SAC ¶¶ 149-62), as well as retaliation in violation of 29 C.F.R. § 33.13 (*id.* at ¶¶ 163-67), claims under 42 U.S.C. § 1983 (*id.* at ¶¶ 168-77), and pendent state law claims (*id.* at ¶¶ 168-77).

On August 20, 2018, Defendants moved to dismiss the SAC.  (Dkt. #55). Plaintiffs filed an opposition memorandum on September 19, 2018 (Dkt. #58), and Defendants replied on October 4, 2018 (Dkt. #62).[3]

## DISCUSSION

### A.   Defendants' Motion to Dismiss Under Rule 12(b)(1) Is Granted in Part and Denied in Part

Defendants bring the instant motion under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For clarity, the Court addresses Defendants' jurisdictional claims first, and then considers their challenges to the adequacy of Plaintiffs' pleadings.

---

[3]    Also on October 4, 2018, Defendants informed the Court that Plaintiffs' opposition memorandum violated the 30-page limit ordered by the Court, and requested that the Court strike the last five pages.  (Dkt. #64).  After receiving Plaintiffs' reply to that request (Dkt. #65), the Court granted Defendants' application to strike (*see* Dkt. #66). Accordingly, this Opinion considers solely the first 30 pages of Plaintiffs' opposition memorandum.

1.      **Applicable Law**

a.      **Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**

In considering a [Rule 12(b)(1)] motion to dismiss, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Nat. Res. Def. Council* v. *Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). "[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Aurecchione* v. *Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (internal quotation marks omitted); *accord Sokolowski* v. *Metro. Transp. Auth.*, 723 F.3d 187, 190 (2d Cir. 2013). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000). Where subject matter jurisdiction is contested, a district court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Zappia Middle East Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *accord Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014).

b.      **The IDEA Exhaustion Requirement**

Defendants' jurisdictional claims are grounded in the exhaustion requirements of the IDEA. Though Plaintiffs have removed their IDEA claims from the SAC, Defendants maintain that the statute, and its exhaustion requirement, are still implicated.

15

The IDEA requires that, "before the filing of a civil action under [federal law] seeking relief that is also available under this subchapter, [administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under this subchapter."  20 U.S.C. § 1415(*l*).  In *Fry* v. *Napoleon Community Schools*, 137 S. Ct. 748 (2017), the Supreme Court clarified that claims for violations of the ADA and Section 504 of the Rehabilitation Act, or similar laws, are subject to the IDEA's § 1415(*l*) exhaustion requirement if, but only if, they seek relief from the denial of a FAPE.  *Id.* at 750.

*Fry* concerned a school that had indisputably provided a FAPE to a disabled student with cerebral palsy by offering her one-on-one support from a human aid, as required by her IEP.  137 S. Ct. at 752.  The school simultaneously refused to accommodate the student's use of a service animal, allegedly causing the student "emotional distress and pain, embarrassment, and mental anguish."  *Id.*  The Supreme Court held that the IDEA exhaustion requirement did not apply because, as the school had provided a FAPE, no relief was available to the student under the IDEA for the denial of an accommodation for her service animal.  *Id.* at 754.  However, other federal laws, like the ADA or Rehabilitation Act, might require the accommodation of the student's service animal — "unrelated to a FAPE" — and such claims would not be subject to exhaustion under the IDEA.  *Id.*

Under *Fry*, then, because the IDEA does not afford relief for allegations of discrimination other than denial of a FAPE, such claims do not trigger the

16

§ 1415(*l*) exhaustion rule.  *See Fry*, 137 S. Ct. at 753.  Put differently, if a complaint seeks accommodation that "is needed to fulfill the IDEA's FAPE requirement," exhaustion applies; otherwise, it does not apply.  *Id.* at 754.  "Section 1415(*l* ) … requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way."  *Id.* at 755.  To determine whether the gravamen of a complaint concerns a FAPE, courts should ask two questions:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school — say, a public theater or library?  And second, could an adult at the school — say, an employee or visitor — have pressed essentially the same grievance?  When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject.  But when the answer is no, then the complaint probably does concern a FAPE.

*Id.* at 756.

While the Second Circuit has not yet had occasion to rule on an IDEA exhaustion matter following the Supreme Court's opinion in *Fry*, the post-*Fry* decision of another court in this Circuit, *Lawton* v. *Success Academy*, 323 F. Supp. 3d 353 (E.D.N.Y. 2018), is illuminating.  *Lawton* concerned allegations that a Success Academy charter school located in Fort Greene, Brooklyn, used threats to call ACS, threats to call police, and actual calls to police resulting in psychiatric hospitalizations, to discipline students aged four to five with ADHD, ODD, autism, and other learning or behavioral disabilities.  *Lawton,* 323 F. Supp. 3d at 359-61.  The *Lawton* plaintiffs also alleged that the school's

principal had deliberately targeted these students because of their disabilities in an attempt to push them out of the school; segregated the disabled students from other students; denied them "the right to participate in the program to the same extent as other pupils"; and repeatedly removed the children from their classrooms via early dismissals and suspensions, without providing "academic instruction during the time that they were removed from the classroom." *Id.* at 362.

*Lawton* concluded that the IDEA exhaustion requirement did not apply because, while the allegations "occasionally touch[ed] on the denial of a FAPE and failure to reasonably accommodate the students, the vast majority of the allegations, and thus the gravamen of the complaint, concern[ed] intentional discrimination and retaliation." *Lawton*, 323 F. Supp. 3d at 362. Applying the test from *Fry*, the court reasoned that "[t]he disabled children would have a claim against a public library that placed them on a list of excluded patrons, used strict disciplinary rules to remove them on a daily basis, and threatened to call the police when faced with complaints about the mistreatment. So would disabled adults." *Id.* *Lawton* relied on a similar post-*Fry* opinion from the Eleventh Circuit, which stated that repeated removals of a disabled student from the classroom "for discriminatory reasons and for no purpose related to his education" were "cognizable as a separate claim for intentional discrimination under the ADA and § 504." *J.S., III by and through J.S. Jr.* v. *Houston Cty. Bd. of Ed.*, 877 F.3d 979, 986 (11th Cir. 2017).

In contrast, another post-*Fry* decision by a sister court in the Southern District of New York found that a plaintiff's claims *were* subject to the IDEA exhaustion requirement where they sought relief for "modifying where and when teacher hours are provided, adjusting grades and class schedules, or providing additional instruction and communication between the school, the Student's parents, and college counselors," which the court determined to be "all related to providing a FAPE and … not the sorts of requests that could be made outside of discussing the adequacy of [the Student's] education." *J.Z.* v. *New York City Dep't of Educ.*, 281 F. Supp. 3d 352, 361–62 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

The law provides another setting in which exhaustion may be excused. Specifically, the Second Circuit recognizes a "futility exception" to the IDEA exhaustion requirement.  *See J.S. ex rel. N.S.* v. *Attica Cent. Sch.,* 386 F.3d 107, 112 (2d Cir. 2004) ("The requirement is excused … when exhaustion would be futile because the administrative procedures do not provide an adequate remedy."); *Taylor* v. *Vermont Dep't of Educ.*, 313 F.3d 768, 789 (2d Cir. 2002) ("[E]xhaustion is not necessary under the IDEA where it would be futile to resort to the due process procedures or where it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought)." (internal quotation marks and citation omitted)).  "The plaintiff bears the burden of demonstrating futility." *Taylor*, 313 F.3d at 790.

### 2.      Analysis

Defendants argue that the Court lacks subject matter jurisdiction over this matter because Plaintiffs have failed to exhaust their administrative claims by seeking "relief for [their] alleged complaints about K.B.'s education from the IHO[.]"  (Def. Br. 13).  To succeed on this argument, Defendants must first show that Plaintiffs' claims are subject to the IDEA exhaustion requirement, i.e., that the gravamen of Plaintiffs' complaint seeks redress for the denial of a FAPE, and not for violations of the ADA, the Rehabilitation Act, or the Constitution, all of which fall outside the scope of IDEA administrative proceedings.  *See Fry*, 137 S. Ct. at 755.  If Defendants succeed on the first showing, they must then establish that Plaintiffs did not in fact exhaust their available administrative remedies.  For the reasons set forth in the remainder of this section, the Court ultimately concludes that it lacks jurisdiction over two of Plaintiffs' claims, those based on the denial of a consistent paraprofessional and of testing accommodations

####       a.      Certain of Plaintiffs' Claims Are Not Redressable Under
####                the IDEA

Plaintiffs argue that the IDEA does not afford relief for their allegations of intentional discrimination, denial of reasonable accommodations, and violation of constitutional rights, and therefore those claims are not subject to the IDEA's exhaustion requirement.  (Pl. Opp. 12-13).  More fundamentally, they reason that the gravamen of the SAC is *not* directed to the denial of a FAPE because, they contend, an adult could bring the "same type of claims" for forced "disciplinary leave or job demotions" at a workplace, or a child could

bring the same type of claims against a public facility like a library.  (*Id.* at 13).

Specifically, Plaintiffs analogize their allegation that Success Academy called

emergency medical personnel to remove K.B. for disciplinary rather than

medical purposes to a claim that an institution "called EMS to remove an adult

employee with disabilities when no medical emergency existed[.]"  (*Id.* at 14).

They analogize their allegation that Success Academy suspended K.B. and

demoted him to the third grade without additional services to a claim that an

institution forced an adult "into disciplinary leave [and] demotion" as a result of

his disability.  (*Id.*).  And Plaintiffs insist that their allegations of a "pattern of

behavior … including the attempt to disenroll K.B., … repeated suspensions

without proper notice, and the meritless ACS complaints" are distinct from a

claim based on denial of a FAPE.  (*Id.* at 13-14; *see also id.* at 14 (arguing that

they have "stated distinct discrimination claims under the Rehabilitation Act

and the ADA separate from the IDEA claims")).

     Defendants argue, in contrast, that the IDEA exhaustion requirement

applies to all of Plaintiffs' claims because the gravamen of the SAC is an alleged

denial of "educational access and services" at Success Academy.  (Def. Br. 12

(quoting SAC ¶¶ 1-2)).[4]  Defendants maintain that all claims in the SAC arise

from the core allegation "that K.B. was denied access to Success Academy's

---

[4]    Defendants point out that the previously-filed FAC expressly sought redress for Success
Academy's alleged failure to provide a FAPE.  (Def. Br. 11 (quoting FAC ¶¶ 3, 125, 133,
151-52)).  While the SAC no longer uses the term "FAPE," Defendants argue that the
SAC nonetheless relies on the same alleged denial of services and accommodations as
the FAC's FAPE claim.  (Def. Br. 12).  As the Court finds the allegations in the SAC to be
determinative of whether the IDEA exhaustion requirement applies, it declines to
examine the relationship between the FAC and the SAC.

program because it would not modify aspects of its educational program, including disciplinary and academic standards, policies in calling 9-1-1, and educational services." (Def. Reply 3-4). Defendants conclude that these are, in effect, claims for the denial of a FAPE that "cannot 'be made outside of discussing the adequacy of his education.'" (*Id.* at 2-3 (quoting *J.Z.*, 281 F. Supp. 3d at 361-62 (internal quotation marks and alterations omitted))). Specifically, Defendants characterize the SAC as alleging that Success Academy failed to use appropriate standards to accommodate K.B.'s disability, failed to provide K.B. with extra time on tests, demoted K.B. to the third grade without providing additional services, failed to comply fully with the IEP, called 911 for disciplinary rather than medical purposes, and failed to provide reasonable accommodations in its disciplinary suspension policies. (Def. Br. 12; *see also* Def. Reply 3 & n.1 ("Plaintiffs' claims arise out of many aspects of K.B.'s IEP and the levels of support and accommodations he was receiving.")). Defendants contend that these "are not claims that could have been brought by an adult member of the community[.]" (Def. Br. 13). Defendants also insist that there is no exception to the IDEA exhaustion requirement for claims of a "pattern" of "intentional discrimination." (Def. Reply 4).

The Court agrees with Plaintiffs' relief analysis as to most of the claims in the SAC, but disagrees as to those claims based on Defendants' demotion of K.B. to the third grade, alleged failure to comply with the mandates of the IEP, and alleged failure to provide testing accommodations. The SAC alleges that

Success Academy engaged in inappropriate disciplinary practices toward K.B., including threats to call ACS without proper justification, at least one actual referral to ACS without proper justification, and calls to emergency medical personnel without a legitimate medical purpose, one of which resulted in a forced hospitalization without medical need. These allegations transcend claims of inadequate educational services that could be remedied under the IDEA. Moreover, Defendants' argument that Plaintiffs seek "different discipline standards than [K.B.'s] non-disabled peers" is undermined by the SAC's allegations that it was Defendants who targeted K.B. with unique forms of discipline. Plaintiffs do not seek a special disciplinary procedure for K.B.; they seek protection from what they claim to be abusive disciplinary measures on the part of Defendants.

As in the Eleventh Circuit's decision in *J.S., III*, the SAC's allegations that Defendants suspended K.B. "for discriminatory reasons" unrelated to his education, while failing to provide him with alternative instruction during these suspensions, are "cognizable as a separate claim for intentional discrimination under the ADA and § 504." *J.S., III*, 877 F.3d at 986. And, as in *Lawton*, the SAC's allegations that Defendants used threats to call law enforcement and ACS, as well as suspensions and removals, to discriminate against K.B. and force him out of the school, do not trigger the IDEA exhaustion requirement. *Cf. Lawton*, 323 F. Supp. 3d at 359-61. (*See also* Pl. Opp. 14-15).[5]

---

[5]    Defendants seek to distinguish *Lawton* on its facts because, in addition to claims based on services and disciplinary accommodations, the *Lawton* complaint alleged that the school principal had placed the plaintiffs on a list of students he wanted to be expelled.

However, the SAC's allegations that K.B. was demoted to third grade "because K.B. had not been able to do the 4th grade work" (SAC ¶ 105); that Defendants failed to comply with the mandates of K.B.'s IEP (*id.* at ¶ 66); and that Defendants failed to provide testing accommodations (*id.* at ¶ 100), are properly classified as complaints about the adequacy of educational services. These claims are based on the denial of a FAPE and thus fall within the scope of the IDEA.

### b.   Certain of Plaintiffs' Claims Fall Within the Futility Exception

The determination that certain of Plaintiffs' claims fall within the scope of the IDEA does not end the Court's inquiry into the applicability of the IDEA exhaustion requirement; the Court must now consider whether Plaintiffs' claims based on demotion to the third grade, failure to comply with the IEP, and failure to provide testing accommodations, fall within the Second Circuit's futility exception, which applies where "the plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *J.S. ex rel. N.S.*, 386 F.3d at 114; *see also Taylor*, 313 F.3d at 790 ("[I]f plaintiffs can demonstrate that there is no relief available to them through the administrative

---

(Def. Reply 6 n.2). This is a distinction without a difference, as the SAC repeatedly alleges that Defendants discriminated against K.B. "to pressure him to leave" the school. (*See, e.g.*, SAC ¶ 1).

process, they may avail themselves of the futility or inadequacy exceptions to the exhaustion requirement[.]").  Of potential significance to this motion, the Second Circuit has recognized that the futility exception applies to claims that "involve nothing more than 'implementation' of services already spelled out in an IEP."  *Polera* v. *Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 489 (2d Cir. 2002).

Plaintiffs argue that the futility exception for claims based solely on a failure to implement services stated in an IEP applies to their claims based on failure to provide a 12:1 classroom, a consistent paraprofessional, and testing accommodations, all of which were allegedly mandated by K.B.'s IEPs.  (Pl. Opp. 11).  Defendants argue in opposition that "this exception only applies where the claim 'solely' arises out of a failure to apply an IEP's clear mandates," and that "here the claims go far beyond application of the IEP, which was hardly clear."  (Def. Reply 7).

The Court finds that K.B.'s IEPs from the summer of 2015 and from December 14, 2016, both clearly mandated that K.B. be provided with a 12:1 classroom — which, it is alleged, Defendants refused to provide at Success Academy (instead referring Plaintiffs to other schools where 12:1 classrooms would be available).  (SAC ¶¶ 57, 64-66).  Accordingly, Plaintiffs' claims based on failure to implement the IEP mandate for a 12:1 classroom fall within the futility exception to the IDEA exhaustion requirement.[6]

---

[6]    The Court recognizes that Defendants may not have had an obligation to provide a 12:1 placement at Success Academy in the Bronx, and that the IEP's mandate may have been satisfied by the availability of 12:1 classrooms in other schools, in which Plaintiffs

As to Plaintiffs' claims for a consistent paraprofessional and testing accommodations, the SAC alleges that the December 14, 2016 IEP "required a one-on-one crisis management paraprofessional, but confusingly only included a recommendation of group service by a full-time crisis management paraprofessional." (SAC ¶ 64). This allegation does not adequately plead either a clear mandate in the IEP to provide a *consistent* paraprofessional or a clear mandate to provide testing accommodations. Therefore, Plaintiffs' claims based on failure to implement a consistent paraprofessional or testing accommodations are not covered by the futility exemption.

Plaintiffs also argue that K.B.'s demotion to the third grade breached the IDEA's stay-put requirement, and that claims of a breach of the stay-put requirement are exempt from exhaustion. For support, Plaintiffs point to *Honig* v. *Doe*, 484 U.S. 305 (1988), in which the Supreme Court recognized a futility exception to the exhaustion requirement under a related statute, the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.* (the "EHA"). *Id.* at 327. *Honig* clarified that, in the context of the EHA, Congress implemented a "stay-put" provision "to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings[,]" and therefore the "stay-put provision in no way purports to limit or pre-empt the authority conferred on courts[.]" *Id.* Plaintiffs rely on this assertion to conclude that "[s]tay-put issues are not subject to the

---

chose not to enroll K.B. *See, e.g., S.F.* v. *New York City Dep't of Educ.*, No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *12 (S.D.N.Y. Nov. 9, 2011). That is an issue for the merits, however, not for a determination of the exhaustion requirement.

exhaustion requirement." (Pl. Opp. 11).  Defendants' reply brief does not respond to this argument, and it would appear that Defendants have waived any opposition to it.  The Court finds that, to the extent Plaintiffs' claims are based on a breach of the IDEA's stay-put requirement, they are exempt from the exhaustion requirement.

Finally, Plaintiffs argue more broadly that seeking any additional relief through the administrative process above and beyond the proceeding that they *did* undertake before the IHO would have been futile because Defendants had chosen not to participate in the IHO administrative process.  (Pl. Opp. 11-12 (citing SAC ¶ 122)).  That non-participation, Plaintiffs argue, "undermines the rationale for the exhaustion requirement, which is to adequately develop a complete factual record and promote judicial efficiency."  (Pl. Opp. 12, n.2 (citing *J.S.*, 386 F.3d at 112)).  Defendants reply that the administrative process could not have been futile because it resulted in substantial relief, "including tutoring and a 12:1 placement," and point out that Plaintiffs did not appeal the IHO order, and that that order was enforced by this Court.  (Def. Reply 7 (citing Dunn Decl., Ex. 6 at 19)).  Moreover, the fact that Defendants did not participate in the administrative hearing is of no relevance given that it was Plaintiffs who declined to name Success Academy as a "party" to that hearing, and given that schools do not generally participate in such hearings under New York Law.  (Def. Reply 8 (citing N.Y. Comp. Codes R. & Regs. tit. 8,

§ 200.5(j)-(k)).[7]  The Court agrees with Defendants that their non-participation in the administrative hearing does not support an inference that the IHO administrative process was futile in general.

In sum, Plaintiffs' claims based on failure to implement an IEP mandate for a consistent paraprofessional or testing accommodations are subject to the IDEA's exhaustion requirement.  Plaintiffs' remaining claims are not.

### c.   Plaintiffs Failed to Exhaust Their Administrative Remedies for Their Claims Regarding a Consistent Paraprofessional and Testing Accommodations

Having determined which of Plaintiffs' claims are subject to the exhaustion requirement, the Court now considers whether Plaintiffs exhausted their administrative remedies.  Plaintiffs argue that, for those allegations "that could be addressed through the IDEA administrative process," they have exhausted their administrative remedies by pursuing the claims before the IHO.  (Pl. Opp. 11).  According to Plaintiffs, these include Defendants' alleged "failure to comply with the stay-put requirement of the IDEA," and failure to comply with K.B.'s IEP.  (*Id.*).  And as the IHO "issued a decision on July 18, 2018, ordering the DOE to provide K.B. with 375 hours of compensatory education, which was not appealed[,]" Plaintiffs contend that they have

---

[7]     Defendants also contest Plaintiffs' intimation that Success Academy's resistance to complying with a subpoena during the administrative proceeding indicated that further administrative proceedings would have been futile.  (Pl. Opp. 12 n.2; Def. Reply 8-9). Defendants contend that Plaintiffs have misled this Court in making the assertion, and similarly misled the IHO into thinking that Success Academy ignored the subpoena in bad faith, when in fact the school was simply trying to negotiate a confidentiality stipulation to protect the privacy of other students' records in the document production. (Def. Reply 8-9).  The Court shares Defendants' concerns about this portion of Plaintiffs' briefing, and admonishes Plaintiffs' counsel to be more attentive to the facts in future submissions to this Court.

exhausted their administrative remedies.  (Pl. Opp. 11).  The Court does not

agree.  Plaintiffs had the rights to an administrative appeal of the IHO decision,

to indicate that the relief awarded was inadequate, or to bring to the IHO the

claims brought for the first time to this Court.  As they have elected to do none

of the three, they have failed to exhaust their administrative remedies for

claims that could have been addressed under the IDEA appeal.  That includes

the claims based on failure to implement a consistent paraprofessional or

testing accommodation.  Therefore, the Court lacks jurisdiction over those

particular claims, which are, accordingly dismissed.[8]

## B.  Defendants' Motion to Dismiss Under Rule 12(b)(6) Is Granted in Part and Denied in Part

### 1.  Applicable Law

#### a.  Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), the court

must "draw all reasonable inferences in [the non-movant's] favor, assume all

well-pleaded factual allegations to be true, and determine whether they

plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648

F.3d 98, 104 (2d Cir. 2011) (internal citations and quotation marks omitted).  A

claimant prevails on a motion to dismiss if the complaint "contain[s] sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on

---

[8]     Defendants also accuse Plaintiffs of "strategically withdr[awing] their Section 504 claim at the last minute," and hence argue that Plaintiffs should not be afforded the benefit of exhaustion.  (Def. Reply 6).  But, as explained above, Plaintiffs' Section 504 claim arises from conduct that is not subject to the exhaustion requirement, and so its withdrawal is irrelevant to a determination of exhaustion.

its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v.

*Twombly*, 550 U.S. 544, 570 (2007)).

### b.     The ADA and the Rehabilitation Act

The Second Circuit instructs that

> [t]o establish a *prima facie* case of discrimination under
> either the ADA or Section 504, a plaintiff must show the
> following: [i] plaintiff is a qualified individual with a
> disability; [ii] plaintiff was excluded from participation
> in a public entity's services, programs or activities or
> was otherwise discriminated against by the public
> entity; and [iii] such exclusion or discrimination was
> due to plaintiff's disability.  Exclusion or discrimination
> may take the form of disparate treatment, disparate
> impact, or failure to make a reasonable accommodation.

*B.C.* v. *Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (internal

citations, quotation marks, and alterations omitted).[9]

"Courts in this Circuit have recognized that a Section 504 claim may be

predicated on the claim that a disabled student was denied access to a free

appropriate education, as compared to the free appropriate education non-

disabled students receive.  Such a claim, however, requires proof of bad faith or

gross misjudgment."  *C.L.* v. *Scarsdale Free Union Sch. Dist.*, 744 F.3d 826, 841

(2d Cir. 2014) (internal citations and quotation marks omitted).  Plaintiffs who

sue non-state governmental entities under Title II of the ADA, or who bring

---

[9]     Plaintiffs' claims under the ADA and the Rehabilitation Act are evaluated using the
same standards.  *See Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *cf.
Logan* v. *Matveevskii*, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) (discussing differences
between ADA and Rehabilitation Act, including that Rehabilitation Act applies solely to
federally-funded programs and is limited to denials of benefits "solely by reason of …
disability" (citing 29 U.S.C. § 794(a))).  The Court's references in this Opinion to claims
under the ADA should be read to include Plaintiffs' correlative Rehabilitation Act claims.

claims under § 504 of the Rehabilitation Act, must show that the defendant's conduct was with "deliberate indifference" to a disabled person's rights. *Garcia* v. *S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001). Plaintiffs who bring a suit for monetary damages against a state for a violation of Title II of the ADA must satisfy the more onerous burden of showing that the defendant's conduct "was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111.

### c.    Due Process and the Fourth Amendment

Three forms of due process protection are potentially relevant to this action: protection of a student's property interest in their education from suspension without adequate process; substantive due process protections from bodily restraint that shocks the conscience; and parents' procedural due process rights to direct their child's medical care.

"Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss* v. *Lopez*, 419 U.S. 565, 581 (1975). "Generally, it is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination; the opportunity need not be pre-deprivation." *Kennedy* v. *City of New York*, No. 12 Civ. 4166 (KPF),

2015 WL 6442237, at *16 (S.D.N.Y. Oct. 23, 2015) (internal citations and quotation marks omitted).

"To state a substantive due process claim, a plaintiff must allege that [i] the complained-of state action compromised a constitutionally-protected liberty or property right, and [ii] the state action that deprived him of that interest was oppressive or arbitrary." *JG & PG ex rel. JGIII* v. *Card,* No. 08 Civ. 5668 (KMW), 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009). "Liberty from bodily restraint ... [is at] the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg* v. *Romeo,* 457 U.S. 307, 315 (1982). Conduct is "arbitrary or oppressive" if it "shock[s] the conscience." *West* v. *Whitehead,* No. 04 Civ. 9283 (KMK), 2008 WL 4201130, at *13 (S.D.N.Y. Sept. 11, 2008). "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento* v. *Lewis,* 523 U.S. 833, 849 (1998).

Parents have a procedural due process right to direct their child's medical care, which may be violated by government officials' removal of a child even for a brief period of time. *See Phillips* v. *County of Orange*, 894 F. Supp. 2d 345, 375 (S.D.N.Y. 2012). Courts considering whether a removal violated a parent's procedural due process rights must evaluate whether the removal was justified as an "appropriate response to a legitimately perceived emergency." *Tenenbaum* v. *Williams*, 862 F. Supp. 962, 970 (E.D.N.Y. 1994). A showing of

emergency circumstances requires "objectively reasonable evidence that harm

was imminent." *Phillips*, 894 F. Supp. 2d at 374.

Finally, "[t]he [Fourth Amendment] probable cause requirement extends

to cases in which police officers seize a person for a psychiatric evaluation.

Specifically, the Fourth Amendment requires probable cause to believe that the

person to be arrested is dangerous to himself or to others." *Moffett* v. *Town of

Poughkeepsie*, No. 11 Civ. 6243 (ER), 2012 WL 3740724, at *9 (S.D.N.Y.

Aug. 29, 2012).

### 2.   Discussion

#### a.   Plaintiffs Have Stated Claims for Discrimination Under the ADA and the Rehabilitation Act

Defendants argue that Plaintiffs have failed to state a claim under the

ADA or the Rehabilitation Act because they "merely claim[] that KB was denied

a FAPE with bald assertions that it was because of 'discrimination'[.]"  (Def.

Br. 20).  The Court agrees with Defendants that Plaintiffs must plead more

than "conclusory claims that these violations were motivated by

'discrimination'" in order to state a claim under the ADA or the Rehabilitation

Act, but it finds that Plaintiffs have satisfied this pleading requirement.

Plaintiffs argue, and the Court agrees, that the SAC sufficiently alleges

"ADA and Rehabilitation Act liability based on both bad faith and gross

misjudgment and under both the disparate impact and failure to reasonably

accommodate theories of liability." (Pl. Opp. 16).  Plaintiffs point to three main

factual nodes to support their position, each of which withstands review.

Again, however, the Court underscores that its decision is in large measure the

product of its obligation, at this stage in the proceedings, to credit the well-pleaded allegations in the SAC.

*First*, Plaintiffs challenge Defendants' "unilateral decision to disenroll K.B. at the beginning of the 2017-2018 school year and to bar him from class on the first day of school" without cause or process, and for which Defendants have provided no non-discriminatory explanation. (Pl. Opp. 17). Defendants reply that, because this incident resulted in K.B.'s missing just one day of school, it does not show the required "deprivation of access to school programs." (Def. Reply 10). Defendants are incorrect. As the Supreme Court made clear in *Fry*, discrimination that produces injury in the form of "emotional distress and pain, embarrassment, and mental anguish" may suffice to show a denial of equal access to educational programming, despite satisfactory physical access to educational content. *Fry*, 137 S. Ct. at 752. And here, Plaintiffs allege that Defendants' violations of the ADA and Rehabilitation Act "have caused emotional distress to both S.G. and K.B." (SAC ¶¶ 152, 157, 162, 167). The fact that Defendants' unilateral disenrollment of K.B. caused him to miss just one day of school is not a basis to dismiss this claim.[10]

---

[10]   Defendants also argue that Plaintiffs cannot claim a deprivation of access to educational programming as a result of K.B. missing portions of two school days during his two hospitalizations, or being suspended for ten or fewer days per year, because such absences are permitted under the IDEA. (Def. Br. 22-23). Again, that Defendants denied K.B. physical access to school programs for a comparatively short period of time is no basis for dismissal of Plaintiffs' ADA or Rehabilitation Act claims.

*Second*, Plaintiffs point to school officials' use of EMS to remove K.B. from the school in April 2016, and September 2017, which use "singled him out due to his disability and showed either bad faith or gross misjudgment." (Pl. Opp. 17). The allegations supporting an inference of bad faith, which apply to either or both incidents, include that "Defendants have never provided S.G. with reports explaining or justifying their decisions to call EMS"; that "the hospital saw no need to treat K.B."; that K.B. denied threatening suicide "to both his mother and Emergency Room personnel"; and that K.B.'s paraprofessional "saw no behavior that merited calling 911." (*Id.* at 18). Defendants retort that the allegations of bad faith are belied by the fact that, in both hospitalization incidents, school officials called S.G. before EMS decided to take K.B. to the hospital, and they contend that S.G. herself had reported in K.B.'s IEP that K.B. had been suicidal. (Def. Reply 10). These, however, are disputes of fact that cannot be resolved at this stage of the litigation. Hence, Plaintiffs' ADA and Rehabilitation Act claims based on the two EMS incidents survive dismissal.

*Third*, Plaintiffs cite allegations concerning Defendants' threats to demote K.B., demotion of K.B., and "refusal to comply with a lawful order to reinstate [K.B.] to the fourth grade." (Pl. Opp. 18). Plaintiffs argue that the following allegations support an inference of bad faith or gross misjudgment: "that Defendants raised the possibility of demoting K.B. simultaneously with promoting him at the end of the 2016-2017 school year"; "that Defendants began raising demotion again within two months of the beginning of the 2017-

35

2018 school year" without proposing alternative interventions; and that
Defendants disregarded S.G.'s proposed alternatives and enacted the demotion
"over S.G.'s vehement objection." (*Id.* at 18-19). Plaintiffs further claim that
K.B.'s demotion evinced poor judgment, if not "outright bad faith," given that,
despite 75 days redoing the third grade, K.B.'s final report card in the fourth
grade showed "significant progress toward acceptable achievement of fourth
grade standards." (*Id.* at 19).

On the demotion issue, Defendants contend that Plaintiffs have failed to
meet their burden to plead discriminatory animus because K.B.'s academic
evaluations show that he was not performing at a fourth-grade level, and thus
"Success Academy had ample 'pedagogical reason' for the demotion[.]" (Def.
Br. 22; *see also* Def. Reply 11; Dunn. Decl., Ex. 3 (fourth-grade report card
indicating numerous academic areas where K.B.'s performance was "Below
Expectations")). Relatedly, Defendants argue that their failure immediately to
restore K.B. to the fourth grade upon order by the IHO was appropriate
because the IHO's decision "was contrary to the law and harmed KB." (Def.
Reply 11). Once again, drawing all inferences in Plaintiffs' favor, as the Court
must, the Court finds that Plaintiffs' allegations suffice to support an inference
of bad faith or gross misjudgment. Accordingly, Plaintiffs' claims related to the
demotion also survive dismissal.

Separately, Defendants argue that the SAC fails to plead discriminatory
animus in initiating an ACS investigation in October 2017 based on unexcused
absences. They note that K.B.'s first trimester progress report, dated

36

November 17, 2017, had ten unexcused absences in addition to his suspensions.  (*See* Dunn Decl., Ex. 3; Def. Br. 23).  Moreover, Defendants urge the Court to reject the inference that school personnel called ACS for discriminatory reasons "because of the profound negative policy implications in letting speculative claims proceed against" mandatory reporters.  (Def. Br. 24).  The Court very much understands Defendants' concern, but is not at liberty to draw inferences in Defendants' favor (or undertake policy analyses) at this stage of the litigation.  Taken in the context of the SAC as a whole, the allegations that Defendants initiated the ACS investigation for discriminatory purposes is plausible.  Therefore, these claims as well survive dismissal.

The Court turns now to Plaintiffs' IEP claims.  Plaintiffs argue that Defendants' willful refusal to comply with the mandates in K.B.'s IEP for a 12:1 classroom, a full-time paraprofessional, a modified testing protocol, and a modified disciplinary system amounted to a deliberate and bad faith failure to provide reasonable accommodations.  (Pl. Opp. 19-20).  Addressing the first of these claims, the Court agrees with Defendants that the IDEA does not require a school to provide a 12:1 classroom directly if the school "can arrange with the DOE to get a student into a 12:1 class."  (Def. Reply 11).  *See* 20 U.S.C. § 1414(d)(2); 34 C.F.R. § 300.115; *S.F.*, 2011 WL 5419847, at *12 (stating that parents' rights "do[] not include the right to pick a particular classroom or school.").[11]   However, the issue here is not whether Defendants violated the

---

[11]     "Charter schools are not LEAs [local education agencies] under the IDEA (SAC ¶ 100) and, therefore, they do not have to provide the full range of services in all cases, but

IDEA, but whether they engaged in a deliberate and bad-faith failure to provide reasonable accommodations under the ADA and Rehabilitation Act. The facts alleged in the SAC surrounding the 12:1 classroom support an inference that they did. Specifically, Defendants allegedly informed Plaintiffs that a 12:1 classroom would be available to them at a "local neighborhood New York City public school," but omitted that a 12:1 classroom would also be available "in other schools within Defendants' network of charter schools." (SAC ¶¶ 65-66). That allegation suffices to support an inference that Defendants sought to direct Plaintiffs out of the Success Academy network as a result of K.B.'s disability. Accordingly, Plaintiffs have stated an ADA claim based on Defendants' failure to provide a 12:1 classroom.

Plaintiffs' arguments concerning a failure to provide a full-time paraprofessional, a modified testing protocol, and a modified disciplinary system do not fare as well.[12] To start, Defendants did provide a paraprofessional. There is no support in the SAC for the proposition that K.B. was entitled to have the same paraprofessional work with him each day, or that

---

may arrange to have such services provided by such school district of residence." (Def. Reply 7 n.5 (internal quotation marks omitted)). *See* N.Y. Educ. Law § 2853(4).

[12]   Despite finding that Plaintiffs have failed to exhaust their administrative remedies for claims based on failure to implement a consistent paraprofessional or testing accommodation, the Court evaluates these claims on the merits as separate bases for their dismissal. In so doing, the Court recognizes that the preferred course of action is for courts that find a lack of subject matter jurisdiction to refrain from addressing the merits. *See Cornwell* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385-86 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further."); *Norex Petroleum Ltd.* v. *Access Indus.*, 540 F. Supp. 2d 438, 449 (S.D.N.Y. 2007) (dismissal for lack of jurisdiction "moots, and thus terminates, all other pending motions"). However, given the paucity of post-*Fry* case law, and the possibility that the Second Circuit could arrive at a conclusion contrary to that espoused by this Court, the Court will address the merits.

Defendants' provision of various paraprofessionals in any way resulted in K.B.'s exclusion from school programming.  Nor does the SAC support an inference that K.B. was entitled to a modified testing or disciplinary procedure, that the denial of such an accommodation resulted in his exclusion from school programming, or that Defendants' refusal to provide these accommodations was motivated by discriminatory animus.  Therefore, Plaintiffs' ADA and Rehabilitation Act allegations based on failure to provide a full-time paraprofessional, a modified testing protocol, and a modified disciplinary system fail to state a claim.

Finally, Defendants argue that Plaintiffs cannot bring ADA or Rehabilitation Act claims against the Individual Defendants in their individual capacities because there is no individual liability under the ADA.  (Def. Br. 24).  Defendants are correct that, to the extent that Plaintiffs seek money damages against the Individual Defendants under the ADA, such claims must be, and are, dismissed.  *Askins* v. *New York City Transit*, No. 11 Civ. 6371 (PGG), 2013 WL 142007, at *4 (S.D.N.Y. Jan. 8, 2013) ("[P]laintiffs may not bring suits for *money* damages against individual defendants under the ADA." (emphasis added)) (collecting authorities); *see also* 42 U.S.C. §§ 12131-12132 (stating that the ADA prohibits discrimination by public entities, not by individuals).  However, "Title II and Rehabilitation Act suits for prospective injunctive relief may ... proceed against individual officers in their official capacity."  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

Here, beyond monetary damages, Plaintiffs seek declaratory relief. (*See* SAC 40 ("Plaintiffs respectfully request[] that this Court: Declare that Defendants have violated the rights of K.B. and S.G. under the Americans with Disabilities Act [and] Section 504 of the Rehabilitation Act[.]")). Therefore, to the extent that Plaintiffs seek monetary damages against the Individual Defendants under the ADA, those claims are dismissed. To the extent that Plaintiffs seek a declaratory judgment against the Individual Defendants under the ADA, those claims survive.

In sum, Plaintiffs' ADA and Rehabilitation Act claims based on failure to provide a full-time paraprofessional, a modified testing protocol, and a modified disciplinary system are dismissed, as are Plaintiffs' ADA claims seeking monetary damages against the Individual Defendants. Plaintiffs' remaining ADA and Rehabilitation Act claims for discrimination survive.

### b. Plaintiffs Have Stated Claims Under the ADA and the Rehabilitation Act for Retaliation

"[T]he elements of a retaliation claim under either Section 504 or the ADA are [i] a plaintiff was engaged in protected activity; [ii] the alleged retaliator knew that plaintiff was involved in protected activity; [iii] an adverse decision or course of action was taken against plaintiff; and [iv] a causal connection exists between the protected activity and the adverse action." *Weixel* v. *Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002). Plaintiffs argue that they have adequately pleaded retaliation by alleging that "Defendants called ACS in bad faith one day after a meeting with S.G. in which she objected to their telling her that they were considering demoting K.B. and in which she pressed

them for accommodations and for full compliance with his IEP." (Pl. Opp. 21 (citing SAC ¶ 101)). Defendants reply that the retaliation claim is "defeated by Plaintiffs' admission that the ten days of unexcused absences on his first trimester report" are days above and beyond the suspension absences, effectively offering a more benign explanation for their conduct. (Def. Reply 12). These arguments underscore the factual dispute as to Defendants' motivation in calling ACS that cannot be resolved on a motion to dismiss. (Pl. Opp. 22). Defendants' motion to dismiss these claims is therefore denied.

### c. Plaintiffs' Constitutional Claims Are Dismissed in Part and Sustained in Part

Plaintiffs also bring various constitutional claims under 42 U.S.C. § 1983. The Court considers first whether the allegations state viable claims and, if so, whether the persons and entities named in the SAC are parties against whom such claims can be maintained.

### i. Applicable Law

Section 1983 establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992) (citation omitted). As such, a "§ 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is or her] federal statutory rights, or h[is or her] constitutional rights or privileges."

41

*Annis* v. *County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.").

### ii.    The SAC Adequately Alleges Claims Relating to Use of EMS to Remove K.B. From the School

Plaintiffs bring claims for unreasonable search and seizure, and for violation of due process, based on Defendants' "causing KB to be removed from school to the emergency room without parental consent when there was no urgent medical necessity."  (SAC ¶¶ 168-74).  Plaintiffs also bring a claim for violation of S.G.'s procedural due process right "to control and direct K.B.'s medical care."  (Pl. Opp. 26).

Defendants argue that Plaintiffs' constitutional claims fail because the SAC does not allege that Defendants exercised control over the EMS personnel who transported K.B. to the hospital, and because the seizure was neither unreasonable nor shocking to the conscience.  (Def. Br. 27).  Defendants point to the fact that S.G. was allegedly "kept fully informed" during the first hospitalization incident, and that during the second incident, K.B. "was 'upset,' 'crawled under his desk,' [and] tried to flee the classroom," and that S.G. was "contacted" while K.B. was being hospitalized.  (*Id.*).  These arguments do not suffice at this stage of the litigation.  *First*, the facts alleged support an inference that Defendants anticipated that EMS personnel would seize K.B., and called EMS with the intention to set that process in motion, drawing a

direct causal link between Defendants' conduct and the alleged injury. *Cf.*
*Taylor* v. *Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 686 (2d Cir. 1998).[13]
*Second*, when considered within the context of the SAC as a whole, Defendants
are alleged to have deliberately and in bad faith used the EMS removal and
hospitalization as a form of discipline, without any legitimate medical purpose,
while fabricating a risk of suicide to explain their conduct, and informing S.G.
of that fabricated risk. (*See* Pl. Opp. 24-26). Such conduct, if proven, easily
would support findings that the seizure was unreasonable, and that
Defendants' actions shocked the conscience. Therefore, drawing all reasonable
inferences in Plaintiffs' favor, the SAC adequately pleads that school officials
violated the Fourth Amendment and due process in calling EMS.

Considering S.G.'s procedural due process right "to control and direct
K.B.'s medical care," Plaintiffs allege that both the 2016 and the 2017 calls to
EMS, and the resultant removals and hospitalizations of K.B., took place
without S.G.'s consent. (Pl. Opp. 28). The Court agrees that Plaintiffs have
adequately alleged that "those removals violate S.G.'s procedural due process
rights unless they occurred in emergency circumstances." (*Id.*). According to
the SAC, neither scenario involved an emergency, as school officials in both
instances resorted to calling 911 for disciplinary rather than medical purposes.

---

[13]     Indeed, Defendants' repeated characterization in their briefing that K.B. "tried to flee
the classroom" suggests that it was Defendants who first seized K.B., and not the EMS
personnel. (*See, e.g.*, Def. Br. 7, 27).

Therefore, drawing all reasonable inferences in favor of Plaintiffs, these factual allegations adequately plead a violation of S.G.'s due process rights.

### iii.    The SAC Adequately Alleges Claims Regarding K.B.'s Suspensions

Plaintiffs also claim a procedural due process violation based on the suspensions of K.B. without prior notice.  (SAC ¶¶ 175-77).  Here, Defendants contend that, as each of K.B.'s suspensions was for ten days or less, *Goss* applies and they satisfied the notice and explanation requirements thereunder. (Def. Br. 25).  In particular, Defendants assert "that SG was given notice and a general description of the reasons why KB was being suspended each time, and was invited to discuss the suspensions."  (*Id.* at 25 n.12 (citing SAC ¶¶ 82, 94, 99, 103)).  Defendants also contend that Plaintiffs had a post-deprivation remedy in the form of "compensatory services to make up for the classes KB missed and modifications to the IEP to account for his behavior."  (*Id.* at 26).

However, drawing all inferences in Plaintiffs' favor, the allegations in the SAC do not support Defendants' position.  To start, Plaintiffs do allege that K.B. "felt he had no opportunity to give his side of the story when he was told a suspension was being issued against him."  (SAC ¶ 134).  Defendants' notices to S.G. refer to an opportunity to discuss, but not to contest, the suspensions. (*Id.* at ¶ 58).  In short, K.B. was denied the required "opportunity to present his side of the story."  *Goss*, 419 U.S. at 581.  And the existence of post-deprivation remedies would not alleviate any constitutional violation in this matter, because *Goss* established that notice and hearing should generally

44

precede a suspension, *see Goss*, 419 U.S. at 582, and post-deprivation

remedies are not a substitute for generally "established procedures," *Hellenic*

*Am. Neighborhood Action Comm.* v. *City of New York*, 101 F.3d 877, 880 (2d Cir.

1996).  Therefore, at this stage, the Court cannot find that procedures

surrounding K.B.'s suspensions satisfied due process as a matter of law.

### iv.   Plaintiffs' Constitutional Claims Against Institutional Defendants Success Academy and Success Academy Bronx 2 Adequately Plead Liability Pursuant to *Monell*

"[A] local government may not be sued under § 1983 for an injury

inflicted solely by its employees or agents.  Instead, it is when execution of a

government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the

injury that the government as an entity is responsible under § 1983."  *Monell* v.

*Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A plaintiff

may establish municipal liability under *Monell* in several ways, including by

presenting evidence of:

> [i] an express policy or custom, [ii] an authorization of a policymaker of the unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a "deliberate indifference" to the rights of its citizens, or [iv] a practice of the municipal employees that is "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials."

*Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting

*Pangburn* v. *Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)).

Plaintiffs allege that *Monell* violations "resulted from two official policies maintained by Defendants: [i] suspending students without adequate due process, and [ii] seizing students with disabilities and delivering them to EMS for removal without medical necessity or parental consent." (Pl. Opp. 30). Regarding a formal policy of suspensions without sufficient process, the SAC alleges three such suspensions in 2015-2016 (SAC ¶ 58), two such suspensions in 2016-2017 (*id.* at ¶ 67), and at least six such suspensions in 2017-2018 (*id.* at ¶¶ 82, 99, 103, 130, 132-33), including one resulting from incidents leading up to the September 11, 2017 EMS incident (*id.* at ¶¶ 85, 94-95). The sheer number of alleged instances of violative suspensions adequately pleads circumstantial facts from which a reasonable factfinder could infer either a "failure of [Success Academy] to train its employees, which exhibits a deliberate indifference to [constitutional rights]," or "a practice of the municipal employees that is so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials." *Biswas*, 973 F. Supp. 2d at 536 (internal quotation marks and citation omitted). Therefore, drawing all inferences in favor of Plaintiffs, they have adequately stated a claim for *Monell* liability based on an alleged Success Academy policy of suspending students without adequate process.

Similar reasoning applies to the alleged policy of misusing EMS. The SAC alleges two separate incidents of unjustified use of EMS for purposes of disciplining K.B., one on April 14, 2016, and the other on September 11, 2017. (SAC ¶¶ 59-62, 88-93). A reasonable factfinder could conclude that the

conduct in these two instances was both remarkably similar and unlikely to reoccur by mere happenstance.  Drawing all inferences in favor of Plaintiffs, then, the fact that the alleged conduct was repeated could support a reasonable inference of either a failure to train, or a practice "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials." *Biswas*, 973 F. Supp. 2d at 536 (internal quotation marks and citation omitted).  Plaintiffs have thus also adequately stated a claim for a *Monell* violation based on an alleged Success Academy policy of using EMS to discipline students, without a legitimate medical purpose. Plaintiffs' constitutional claims against the institutional Defendants survive.

> **v.  Plaintiffs' Constitutional Claims Against the Individual Defendants Are Dismissed for Failure to Plead Personal Involvement, with the Exception of One Claim Against Defendant Inslee**

"As a prerequisite to an award of damages under Section 1983, a plaintiff must show the personal involvement of the defendants in the alleged constitutional deprivations." *McNaughton* v. *de Blasio*, No. 14 Civ. 221 (KPF), 2015 WL 468890, at *5 (S.D.N.Y. Feb. 4, 2015), *aff'd*, 644 F. App'x 32 (2d Cir. 2016) (summary order); *see generally Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1985) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 1983." (internal citation and quotation marks omitted)).  The personal involvement of a supervisor can be shown in one of five ways:

> [i] actual direct participation in the constitutional violation, [ii] failure to remedy a wrong after being

47

> informed through a report or appeal, [iii] creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, [iv] grossly negligent supervision of subordinates who committed a violation, or [v] failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez* v. *Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon* v. *Coughlin*, 58 F.3d at 873); *see also Grullon* v. *City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to resolve the issue). While recognizing the Second Circuit's silence on the issue, this Court follows the majority view and applies the *Colon* factors to analyze personal involvement. "[G]eneralized contentions that [defendant] 'failed to supervise' [subordinates] are insufficient to establish his personal involvement." *Mancuso* v. *Village of Pelham*, 15 Civ. 7895 (KMK), 2016 WL 5660273 at *11 (S.D.N.Y. Sept. 29, 2016). So too, "the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." *Styles* v. *Goord*, 431 F. App'x 31, 33 (2d Cir. 2011) (summary order).

Defendants argue that Plaintiffs have failed to plead the direct involvement of any of the individual defendants in the alleged constitutional violations. (Def. Br. 29). The Court observes that Plaintiffs do not respond to this argument within the first 30 pages of their opposition brief. The Court also finds independently that the SAC does not adequately allege any of the three Individual Defendants' personal involvement in either the suspension

process or the EMS calls, with the exception of one claim against Defendant Inslee.[14]  The sole allegation in the SAC tying any of the Individual Defendants to the suspensions or EMS incidents is that S.G. met with Defendant Inslee on September 15, 2017, and that Inslee stated that K.B. had been suspended early in the day on September 11, 2017, and that "school officials" had called EMS later that day after K.B. "had been screaming."  (SAC ¶ 95).  The mere fact that Inslee informed S.G. about the incident after it occurred does not show her direct participation in the violations; does not show that she was aware of the violations while they were occurring (much less that she failed to act on such awareness); does not indicate that she either created a custom or policy sanctioning the conduct or allowed one to continue; and does not show that she engaged in grossly negligent supervision.  It is a closer question whether the allegations show that Inslee failed to remedy a wrong after being informed of it.

Of course, that Inslee told K.B. about the September 11, 2017 suspension and EMS incident shows at a minimum that, as of September 15, 2017, Inslee was informed about that incident.  However, no alleged EMS incidents occured after September 15, 2017, and thus nothing in the SAC could support an inference that Inslee failed to remedy the practice of improper use of EMS after she was informed about it.  The same cannot be said of the alleged policy of suspensions with insufficient process.  The SAC alleges at

---

14    The Court observes that Plaintiffs do not bring a constitutional claim based on the allegations concerning ACS.  (*See* Pl. Opp. 22-35; SAC ¶¶ 168-77).

least four such suspensions occurring after the September 15, 2017 meeting. (*See* SAC ¶ 99, 103, 130, 132-33).  Drawing all reasonable inferences in favor of Plaintiffs, the fact that these violative suspensions took place after the meeting could support a finding that Inslee was informed about and failed to remedy a practice of such suspensions.  Therefore, Plaintiffs have adequately pleaded Inslee's personal involvement in the post-September 15, 2017 suspensions.

Nothing in the SAC ties the other Individual Defendants to the suspensions or EMS calls in any way.  Accordingly, Plaintiffs' constitutional claims against the Individual Defendants are dismissed with the exception of solely those claims against Defendant Inslee that concern post-September 15, 2017 suspensions.

## C.    The Court Retains Jurisdiction over Plaintiffs' State Law Claims

Plaintiffs also allege violations of the New York State Constitution based on the alleged suspensions without adequate process and the EMS incidents. (SAC ¶¶ 168-77).  Defendants argue that Plaintiffs' state law claims should be dismissed for lack of subject matter jurisdiction.  (Def. Br. 29).  However, because the Court has sustained some of Plaintiffs' federal constitutional claims, it will retain supplemental jurisdiction over the related state law claims.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiffs' claims based on the denial of a consistent paraprofessional and of testing accommodations are dismissed for

lack of subject matter jurisdiction, and, even were there jurisdiction, are dismissed for failure to state a claim.  Plaintiffs' ADA and Rehabilitation Act claims based on failure to provide a modified disciplinary system are dismissed on the merits, as are Plaintiffs' ADA claims seeking monetary damages against the Individual Defendants.  Plaintiffs' federal constitutional claims against the Institutional Defendants survive, while their federal constitutional claims against the Individual Defendants are dismissed with the exception of solely those claims against Defendant Inslee arising from post-September 15, 2017 alleged suspensions with insufficient process.  Plaintiffs' related state law claims survive.  Plaintiffs' remaining ADA and Rehabilitation Act claims for discrimination and retaliation survive.

The Clerk of Court is directed to terminate the motion at docket entry 55.

Per the Court's individual rules, the parties are ORDERED to meet and confer and submit a proposed case management plan to the Court on or before **April 19, 2019**.

SO ORDERED.

Dated:      March 20, 2019
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge